## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HYUNDAI-WIA MACHINE AMERICA CORP. | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:10-cv-2020 (JCH) |
| | : | |
| NELSON R. ROUETTE and SANDRA J. | : | JANUARY 30, 2013 |
| CALVO-ROUETTE, | | |
|     Defendants. | | |

**RULING RE: MOTION TO STRIKE PARAGRAPH 7 AND EXHIBIT D OF
DECLARATION OF ATTORNEY KIEL (Doc. No. 56), MOTION TO STRIKE
DECLARATION OF RANDALL M. PAULIKENS (Doc. No. 58), AND
MOTION FOR SUMMARY JUDGMENT (Doc. No. 48)**

## I.   INTRODUCTION

Plaintiff Hyundai-Wia Machine America Corp. ("Hyundai") brings this action
against defendants Nelson R. Rouette ("Rouette") and Sandra J. Calvo Rouette ("Calvo-
Rouette") (collectively, "the Rouettes") to pierce the corporate veil and collect a consent
final judgment entered in the District of New Jersey against Quality Machine Solutions,
Inc. ("QMSI"), the corporation owned by the Routtes.

Hyundai has filed a Motion for Summary Judgment (Doc. No. 48).  Attached to
Hyundai's Motion was the Declaration of Attorney Edward S. Kiel ("Kiel") and, attached
as Exhibit D to that Declaration, an expert report issued by Withum Smith Brown
("Withum").  The Rouettes filed a Motion to Strike the Withum report and any references
to that report in Kiel's Declaration (Doc. No. 56).  In its Reply brief, Hyundai attached the
Declaration of Randall M. Paulikens ("Paulikens") to respond to the Rouette's attack on
the admissibility of the Withum report.  In response, the Rouettes filed a Motion to Strike
the Paulikens Declaration (Doc. No. 58).

II.    **STATEMENT OF FACTS**

Hyundai manufactures and sells computer numeric controlled machine tools (CNC Machine Tools"). <u>See</u> Defs.' Local Rule 56(a)(2) Statement at ¶ 1.  QMSI is a Connecticut corporation owned by the Rouettes. <u>Id.</u> at ¶¶ 3, 5.  Rouette and Calvo-Rouette are married and own 49% and 51% of the shares of QMSI, respectively. <u>Id.</u> at ¶¶ 4-5.  At all relevant times, the Rouettes were the sole officers, directors, and shareholders of QMSI. <u>Id.</u> at ¶ 33.

From 2004 to 2008, QMSI was a distributor for Hyundai, selling CMC Machine Tools to its customers.  Id. at ¶ 6.  In many transactions, Hyundai would ship the CNC Machine Tools directly to QMSI's customers. <u>Id.</u> at ¶ 7.  Customers would pay QMSI directly, and Hyundai would invoice QMSI for the dealer price of the CNC Machine Tools. <u>Id.</u>  QMSI was obligated to pay Hyundai for the dealer price and was entitled to keep the difference as commission. <u>Id.</u>  In addition, there were other ways in which QMSI customers paid for Hyundai CNC Machine Tools: (1) Hyundai would invoice QMSI customers directly and receive all payments, or (2) QMSI customers would receive a loan from a financing company, who would pay either QMSI or Hyundai. <u>Id.</u> at ¶ 12.  QMSI received full payment from virtually every sale of Hyundai CNC Machine Tools.  Id. at ¶ 28.  The sales were all at a profit to QMSI. <u>Id.</u>

During the first two years as Hyundai's distributor, QMSI paid for all purchases. <u>Id.</u> at ¶ 17.  However, starting in 2006, QMSI started to fall behind in its payments. <u>Id.</u> In connection with the present litigation, Hyundai obtained QMSI's QuickBooks electronic file. <u>Id.</u> at ¶ 15.  Hyundai retained Withum, a forensic accounting firm, to

analyze QMSI's QuickBooks file.  Id. at ¶ 16.  The following chart shows QMSI's income, the shareholder distributions taken by the Rouettes from QMSI, and the shareholder equity on a yearly basis:[1]

|  | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|
| S-Corp. | $113,781 | ($153,432) | $253,860 | ($287,190) | ($72,981) |
| Shareholder Distribution | $190,270 | $434,962 | $173,421 | $337,652 | $1,136,305 |
| Shareholder Equity | ($23,781) | ($640,543) | ($382,140) | ($1,042,663) | N/A |

Id. at ¶ 20.  Despite QMSI having losses and negative shareholder equity from 2005 to 2008, the Rouettes paid themselves over $1.1 million in shareholder distributions.  Id. at ¶ 21.  In addition to taking shareholder distributions, the Rouettes paid themselves salaries and took addition perquisites from QMSI.  Id. at ¶ 22.  Based on QMSI's QuickBooks accounting, the wages and perquisites for the Rouettes, on a yearly basis, was:[2]

|  | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|
| Wages | $43,200 | $56,904 | $70,415 | $86,971 | $257,491 |
| Perquisites | $103,000 | $104,000 | $139,000 | $134,000 | $480,000 |
| Total | $146,200 | $160,904 | $209,415 | $220,971 | $737,491 |

---

[1] The Rouette's object to the chart "inasmuch as it is based upon non-admissible hearsay evidence" and "as this expert's report has not been verified by the author."  Defs.' L.R. 56(a)(2) St. at ¶ 20.  This objection also forms the basis of the Rouette's Motion to Strike, which the court considers—and denies—below.  Therefore, the chart is deemed admitted.  See id. ("Without waiving said objection, the Defendants admit that the chart contained in Paragraph 20 is contained in the so called expert's report.").

[2] The Rouette's similarly object to this chart.  For the reasons stated above, see supra, n.1, the chart is deemed admitted.

Id. at ¶ 22.  Around December 5, 2008, the Rouettes purchased their home on 54 Hang Dog Lane for $2 million.  Id. at ¶ 30.  However, according to the Rouettes, the house was financed with a mortgage for $1.5 million.  Id.

Withum's review and analysis of MSI's financial information also revealed the extent to which the Rouettes used the corporate AMEX cards for personal expenses. Id.  at ¶ 16.  Since 2004, Rouette used his QMSI-issued corporate American Express ("AMEX") credit card to pay for personal purchases.  Id. at ¶¶ 13, 24.  Rouette denies using the AMEX card to pay for all of his personal expenses.  Id.  However, Rouette would only use the corporate AMEX cards to make personal purchases, even though he had a personal credit card.  Id. at ¶ 25.  Calvo-Rouette used her AMEX card for a small number of personal purchases from 2004 to October 2007.  Id. at ¶ 26.  In November 2007, Calvo-Rouette was issued a QMSI corporate AMEX Centurion card.  Id.  She began to use the Centurion card to make all of her personal purchases unless the merchant did not accept American Express.  Only in such cases did Calvo-Rouette use her personal credit card.[3]  Id.

The use of the AMEX card by Rouette, Calvo-Rouette, and other employees was so extensive that the AMEX card would have to be reconciled for "one week every month."  Id. at ¶ 14.  The AMEX card was used for: daily coffees at Starbucks; meals at restaurants such as Wendy's, Olive Garden, and taco Bell; home good supplies from Home Depot, Lowes, and Bed Bath & Beyond; vacations to Disney World and Europe;

---

[3] The Rouettes admitted that Calvo-Rouette used her "personal" AMEX from 2004 to October 2007, and used the corporate Centurion card thereafter.  Defs.' L.R. 56(a)(2) St. at ¶ 26.  Calvo-Rouette only denied ever stating she was "proud" of being a holder of the exclusive Centurion card.  Id. Therefore, as Calvo-Rouette did not deny that she used the Centurion card to make all of her personal purchases unless the merchant did not accept American Express, the court deems that statement admitted.  See L.R. 56(a)(3).

cruises on Holland America; pet supplies at Petco and the Dog Shop; household goods at Costco and Walmart; clothing from Victoria's Secret, L.L. Bean, and Nordstrom; books from Barnes & Noble; sporting goods rfom Dicks and Riverview Tackle & Bait; luxury goods from Coach; songs from iTunes; liquor from K&H Liquors, and more.  Id. at ¶ 23.  The Rouettes characterized the personal purchases on the AMEX cards as "Subchapter S Distributions" in QMSI's accounting.  Id. at ¶ 27.

Other than inputting personal charges into QuickBooks, neither QMSI nor the Rouettes kept track of the personal purchases they made—listed as shareholder distributions—on a regular basis.  Id. at ¶¶ 29, 31.  They reviewed the information only upon receipt of QMSI's tax returns at the end of the tax-reporting year.  Id. at ¶ 31.  No reports were regularly generated from QuickBooks, and no calculations were performed.  Id. at ¶ 32.  The Rouettes solely determined how much money to take as shareholder distributions and never consulted the corporation's Certified Public Accountant (CPA) James A. Lagana about an appropriate amount of shareholder distributions to take from QMSI.  Id. at ¶ 34.  Rouette made "'educated guess[es]' without any 'convention' as to when to take distributions and how much to distribute." Id. at ¶ 35.

According to the Rouettes, at no time did Mr. Lagana inform the Routtes that the shareholder distributions they were taking were excessive and/or improper, nor did Mr. Lagana ever discuss the Rouettes' use of their corporate AMEX cards.  Id. at p. 12.  In addition, according to the Rouettes, QMSI's books and records were prepared by an employee by the name of Leah Ann Doherty.  Id. at pp. 12-13.  The CPA prepared the corporate federal and state income tax returns.  Id. at p. 13.

In a prior litigation, <u>Hyundai-Kia Machine Corp. v. Quality Machine Solutions,</u> <u>Inc.,</u>[4] No. 08-02838 (D.N.J. 2009), Hyundai sued QMSI for money owed from the sale of CNC Machine Tools.  <u>Id.</u> at ¶ 8.  In connection with the prior litigation, QMSI filed a counterclaim, alleging that Hyundai breached various agreements with QMSI and failed to pay money owed to QMSI.  <u>Id.</u> at ¶ 9.  The United States District Court for the District of New Jersey entered a Consent Final Judgment in favor of Hyundai in the amount of $1,650,000.  <u>Id.</u> at ¶ 10.  To date, QMSI has failed to pay Hyundai on the judgment.  <u>Id.</u> at ¶ 11.  According to the Rouettes, the inability to pay the judgment was not due to the amount of distributions they took, but rather due to the fact that the economy crashed in 2008, preventing the corporation from generating sales and profits.  <u>Id.</u> at p. 13.

## III.   STANDARD OF REVIEW

### A.  <u>Motion to Strike</u>

A motion to strike is the proper procedure by which to challenge materials submitted in connection with a summary judgment motion.  The moving party must be specific with regards to what it is seeking to have stricken and must set forth reasons for why the materials should not be considered by the court.  <u>See</u> <u>e.g.</u>, <u>FDIC v. Meyer,</u> 781 F.2d, 1260, 1268 (7th Cir.1986).  A party can make a motion to strike affidavits if they contain inadmissible hearsay or are not made on the basis of personal knowledge. <u>Hollander v. American Cyanamid Co.,</u> 999 F.Supp. 252, 255–56 (D.Conn.1998).  A motion to strike can also be used to challenge documentary evidence which has not been properly authenticated. <u>See</u> <u>e.g.</u>, <u>Dedyo v. Baker Engineering New York, Inc.,</u> 1998 WL 9376, at *4 (S.D.N.Y.1998).

---

[4] Hyundai changed its name from "Hyundai-Kia Machine America Corporation" to "Hyundai-Wia Machine America Corporation" on September 7, 2010.  <u>See</u> Defs.' L.R. 56(a)(2) St. at ¶ 2.

B.  Motion for Summary Judgment

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

**IV.    DISCUSSION**

    A.  <u>Motions to Strike</u>

       The Rouettes argue that paragraph 7 of Kiel's Declaration must be stricken because the statements are not made on personal knowledge.  <u>See</u> Defs.' Mot. to Strike Kiel's Decl. at 1.  Paragraph 7 states that "attached as Exhibit D is a true copy of the expert report issued by Withum Smith Brown in this matter."  Kiel Decl. at ¶ 7.  The Rouettes also argue that the Withum Report must be stricken because it "constitutes inadmissible hearsay" as Kiel is not competent to testify on the matter stated in the report.  Defs.' Mot. to Strike Kiel's Decl. at 2.  The Rouettes also move to strike the Paulikens Declaration—which was attached to Hyundai's Reply in an effort to remedy the issues raised in the Rouettes' first Motion to Strike—as it was filed two weeks after the Rouettes' deadline to respond to Hyundai's Motion for Summary Judgment.  <u>See</u> Defs.' Mot. to Strike Paulikens Decl. at 1.

       Mr. Kiel did not have personal knowledge of the Wilthum report, as he had no involvement in preparing the report.  <u>See</u> Moore's Federal Practice § 56.94[4][a] ("[A]n expert report may be submitted if the expert verifies the report in a deposition or a proper summary judgment affidavit or declaration.").  Had Hyundai only submitted the Kiel Declaration, the court would likely have struck the Wilthum report.  <u>See</u> <u>Cornell Research Foundation, Inc. v. Hewlett-Packard Co.</u>, 2007 WL 4349135, at *19 (N.D.N.Y. Jan. 31, 2007) (stating that "the greater weight of authority" supports the argument that unsworn expert reports constitute inadmissible hearsay and "thus are not worthy of consideration on motion for summary judgment").  However, "[d]espite the potential inappropriateness of submitting the unsworn report of a party's own expert to support or

8

oppose a summary judgment motion, such a defect is, as plaintiffs argue, curable through the submission of an affidavit or a declaration verifying the report's contents." Id. (citing Maytag Corp. v. Electrolux Home Products, Inc., 448 F.Supp.2d 1034, 1064 (N.D. Iowa 2006) ("This court concludes that subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment."); see also Gache v. Town of Harrison, 813 F.Supp. 1037, 1052 (S.D.N.Y. 1993) ("To the extent defendants seek to strike the submissions . . . as unsworn reports by experts, the issues have been mooted by plaintiff's submission of sworn declarations by each of these individuals swearing to the veracity of their statements.  No prejudice results to defendants since the sworn declarations have been submitted by plaintiff well in advance of trial and defendants were already fully cognizant of the opinions of plaintiff's experts").

Therefore, the court grants the Rouette's Motion to Strike paragraph 7 of Kiel's Declaration, as Kiel has no personal knowledge of the Wilthum report.  However, the court denies the Motion to Strike the report itself, as Hyundai has cured its error by filing the Paulikens Declaration.[5]  See Cornell Research, 2007 WL 4349135, at *19.  The Rouette's Motion to Strike the Paulikens Declaration is similarly denied.  See Fed. R. Civ. P. 56(e)(1) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may give an opportunity to properly support or address the fact.").

---

[5] The court suggests plaintiff's counsel in the future properly substantiate expert reports filed in connection with motions for summary judgment in order to avoid the unnecessary briefing that occurred in this case.

9

B. <u>Motion for Summary Judgment</u>

In Counts One and Two, Hyundai seeks to pierce the corporate veil of QMSI and hold the Rouettes liable for the $1.65 million judgment entered against QMSI in the District of New Jersey suit.  "Generally, a corporation is a distinct legal entity that shields its shareholders from the corporation's liabilities."  <u>Wells Fargo Bank, N.S. v. Konover</u>, 2011 WL 1225986, at *5 (D. Conn. Mar. 28, 2011).  However, "Connecticut courts recognize two theories under which the corporate veil may be pierced—the instrumentality rule and the identity rule."  <u>Id.</u>

1. Instrumentality Rule

To pierce the corporate veil under the instrumentality rule, a plaintiff must prove three elements:

> "(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice <u>in respect to the transaction attacked</u> so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; <u>and</u> (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

<u>Angelo Tomosso, Inc. v. Armor Const. & Paving, Inc.</u>, 187 Conn. 544, 553 (1982) (quoting <u>Lowendahl v. Baltimore & O.R. Co.</u>, 247 App. Div. 144, 157 (1936)).

a. Control

The parties debate whether there is a genuine issue of material fact as to whether the Rouettes exercised control over QMSI.  The mere fact that the Rouettes were the sole shareholders, directors, and officers of QMSI does not, in and of itself, support a finding that they exercised control over the corporation.  See <u>Angelo Tomasso, Inc. v. Armor Const., Etc.</u>, 447 A.2d 406, 411, 412 (1982) (stating that, "[t]he

circumstance that control is exercised merely through dominating stock ownership, of course, is not enough").  "The key factor . . . is the element of control or influence exercised by the individual sought to be held liable over corporate affairs."  Id.  Courts look at several factors to determine whether "a corporation was so controlled or dominated," including:

> "(1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own."

Wells Fargo, 2011 WL 1225986, at *6 (quoting Litchfield Asset Mgmt Corp. v. Howell, 799 A.2d 298, 313 (Conn. App. Ct. 2002).

The undisputed evidence is that QMSI was undercapitalized between 2004 and 2008, when the Rouettes received $1,136,305 in total distributions while QMSI was operating at a loss of $72,981, over those years.  Kiel Aff., Ex. 4, at 11; see also Defs.' L.R. 56(a)(2) St. at ¶ 21.  Funds were taken out of the corporation for personal rather than corporate purposes: the Rouettes used corporate funds for personal purposes, including for dinners, home goods, cruises, pet supplies, clothing, books, sporting goods, luxury goods, iTunes purchases, and liquor.  Defs.' L.R. 56(a)(2) St. at ¶ 23. The Rouettes did not account for these personal purchases or the amount of shareholder distributions they received on a regular basis.  Id. at ¶ 31. The Rouettes made "educated guesses" as to how much money to take as shareholder distributions without consulting their CPA Mr. Laguna, Id. at ¶¶ 34-35, suggesting an absence of

corporate formalities.  Although the Rouettes introduced evidence that they employed a bookkeeper and CPA, see Rouette Decl. at ¶¶ 4-5, their mere employment does not diminish the fact that the Rouettes determined their distributions without consulting either.  These facts—that the Rouettes took money from QMSI at a time when the corporation was not showing a profit and that the payments were not authorized under a resolution of the board of directors—support a finding, as a matter of law, that the Rouettes operated QMSI with a "complete disregard of 'corporate formalities' . . . only for the financial advantage" of the Rouettes.  See DeWitt Truck Brokers v. W. Ray Flemming Fruit Co., 540 F.2d 681, 688 (4th Cir. 1976) (finding that the district court did not commit error in piercing the corporate veil when the defendant's "withdrawal [from the corporate account] varied with what could be taken out of the corporation at the moment: If the amount were $15,000, that was Flemming's withdrawal; if it were $25,000, that was his withdrawal").

    b.  Control over specific transaction to commit a wrong

    The second prong of the instrumentality test asks whether the Rouettes exercised control over QMSI in order to perpetrate a fraud or wrong against Hyundai. See Naples v. Keystone Bldg. and Development Corp., 295 Conn. 214, 236 (2010) (stating that the second element of the instrumentality test is that the defendant "used that control 'to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty").  This prong requires Hyundai to prove two things: (1) the Rouettes exercised control over the specific transaction that caused Hyundai harm, see Tomasso, 187 Conn. at 558 (stating that the defendant must have exercised dominance

12

or influence over the specific transaction attacked), and (2) the Rouettes exercised such control to perpetrate a fraud or wrong against Hyundai.

As to the first aspect of the second prong, the court does not believe there is an issue of material fact.  The evidence clearly shows that the Rouettes exercised control over the "specific transaction" that wronged Hyundai, see Tomasso, 187 Conn. at 558, as it was the Rouette's distribution of corporate funds for personal use while QMSI was operating at a loss that Hyundai is attacking.  However, as to whether the Rouettes exercised such control to perpetrate a wrong against Hyundai, the court concludes there is a genuine issue of material fact which makes summary judgment improper.

"[T]he use of the corporate form to avoid paying an obligation incurred by contract that is reduced to a judgment could be sufficient to satisfy the instrumentality rule."  Epperson, 2004 WL 2211715, at *12 (emphasis added).  The plaintiff must prove that the defendants used the corporate form—i.e., exercised control over the specific transaction attacked—so as to commit or avoid liability for any personal wrongful act. See Campisano v. Nardi, 212 Conn. 282, 293 (1989); see also Wells Fargo, 2011 WL 1225986, at *6 (requiring evidence that the defendants used the corporate form and their control to avoid paying the substantial judgment).

On one hand, Hyundai has introduced evidence which could suggest that the Rouettes diverted corporate funds for their personal use so as to avoid paying their invoices, which were ultimately reduced to a judgment, to Hyundai.  The evidence shows that the only dispute regarding payment of the invoices was as to $387,249.02 of the $2,037,249.02 outstanding payment.  Rouette Decl. at ¶¶ 10-11.  The judgment entered in 2009 for $1.65 million reflected the amount owed by QMSI minus the

13

disputed amount owed by Hyundai.  Id. at ¶ 11.  Therefore, between 2006 and 2008,
QMSI knew that it owed Hyundai increasing amounts (totaling $1.65 million by 2009),
but the Rouettes still took shareholder distributions totaling $946,035, Defs.' L.R.
56(a)(2) St. at ¶ 18, even though QMSI was not in a financial position to pay the
Hyundai invoices because it was operating at a loss.  Id. at ¶ 20; see also Wells Fargo,
2011 WL1225986, at *7 (stating that a reasonable jury could conclude that the
defendant foresaw the eventual default of the loan and carried out portfolio sales prior to
initiation of a lawsuit so as to avoid liability).  Furthermore, Hyundai initiated the District
of New Jersey action in 2008, see Rouette Decl. at ¶ 10, yet the Rouettes still took a
$337,652 distribution in 2008, Defs.' L.R. 56(a)(2) at ¶ 20, even though they had notice
of the lawsuit.  See Davenport v. Quinn, 53 Conn. App. 282, 302 (Conn. App. 1999)
(stating that the evidence supported a finding that the second prong of the
instrumentality test was met because the corporation had notice of the lawsuit brought
by the plaintiff and the defendant continued his practice of commingling funds and
removing assets).

        However, the Rouettes argue that any evidence that they diverted corporate
funds for personal use between 2006 and 2008 cannot support a finding that the
Rouettes diverted funds to prevent QMSI from satisfying the later, 2009 judgment,
which did not exist at the time the Rouettes allegedly engaged in any wrongdoing.  See
Pl. Mem. in Opp. Mot. Summ. J. at 10.   The Rouettes have introduced evidence that
they did not pay the Hyundai invoices because "QMSI was disputing the amounts the
Plaintiff claimed it was owed," Rouette Decl. at ¶ 10, and not because they wanted to
avoid paying Hyundai.  This raises a genuine issue of material fact as to the Rouettes'

14

motive in distributing the corporate funds for personal use between 2006 and 2008.

See Wells Fargo, 2011 WL WL 1225986, at *7 (finding genuine disputes of material fact

as to the defendant's role and motive in selling assets); see also Chro ex. Rel. Doe v.

Travel and Tour Services, Inc., 1994 WL 386082, at *3 (Conn. Super. Ct. July 12, 1994)

(stating that, "[a] cause of action seeking to pierce the corporate veil is complex and

may involve questions of motive and intent" which are ill adapted to summary

judgment).

    c.  Causation

    The third prong of the instrumentality rule requires Hyundai to prove that the

Rouettes' control over corporate distributions caused Hyundai's harm, i.e., its inability to

collect the 2009 judgment.  See Naples, 295 Conn. at 236 (stating that the third element

of the instrumentality test is that the aforesaid control and breach of duty . . .

proximately cause[d] the injury").  On this prong as well, the court concludes that there

is a genuine issue of material fact.  On one hand, Hyundai has introduced evidence

that the Rouettes made significant personal purchases using corporate funds at a time

when QMSI was accumulating a debt to Hyundai of $1.65 million.  This evidence could

suggest that, but for the Rouettes' personal purchases, QMSI would have been able to

pay at least a substantial portion of the Hyundai debt.[6]  See Davenport, 53 Conn. at

---

[6] In Commissioner of Environmental Protection et al. v. State Five Industrial Park Inc., et al., 304 Conn. 128 (2012), the Supreme Court of Connecticut held, in a reverse veil piercing suit, that there was insufficient evidence to support a finding that a corporation owner's diversion of corporate assets was the proximate cause of the corporation's failure to pay a judgment.  In State Five, there was only evidence that the owner diverted approximately $342,000, while the judgment owed exceeded $4 million.  Id. at 148.  According to the Supreme Court, those transfers of only ten percent of the total judgment "could not be the proximate cause of the plaintiff's failure to collect a judgment." Id. at 148 n.18.

    That is not the case here.  Between 2006 and 2008, the Rouettes diverted approximately 57 percent ($946,035) of the amount owed to Hyundai by way of shareholder distributions, not to mention

302-03 (stating that, if the corporation "had possessed sufficient funds to satisfy the judgment, the plaintiff would not have had to bring the present case").  However, the Rouettes have introduced evidence that QMSI was unable to pay the 2009 judgment because of a downturn in the economy and not because of any personal purchases that they made in the years prior.  See Commissioner of Environmental Protection et al. v. State Five Industrial Park Inc., et al., 304 Conn. 128, 148 (2012) (stating that "it cannot be argued that the transfer . . . proximately caused their inability to collect on their judgment" when the defendant transferred property more than three years prior to the action, and five years prior to the judgment, that imposed the fines at issue).  Based on this conflicting evidence, the court concludes there is a genuine issue of material fact as to the third prong which precludes summary judgment.

2.   Identity Rule

"The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities."  Wells Fargo, 2011 WL 1225986, at *9 (quoting Tomasso, 447 A.2d at 413).  To pierce the corporate veil under the identity rule, the plaintiff must prove:

> "such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise."

---

the additional $491,290 they took in wages and perquisites between 2006 and 2008.  Defs.' L.R. 56(a)(2) at ¶ 22.

Id. (quoting Zaist v. Olsen, 155 Conn. 563, 576 (1967)).  Although the identity rule "has been primarily applied to reach beyond the veil to another corporation, it may also be employed to hold an individual liable."  Id. (quoting Klopp v. Thermal-Sash, Inc., 13 Conn. 87, 89 n.3 (Conn. App. Ct. 1987)).

There are material issues of fact which prevent the court from granting summary judgment under the identity rule.  The Supreme Court of Connecticut set forth a number of factors which help determine whether a corporation is one 'in name only."  Saphir v. Neustadt, 177 Conn. 191, 210 (1979).  On one hand, unlike the defendant's company in Saphir v. Neustadt, 177 Conn. 191(1979), QMSI filed corporate business tax returns every year.  See Rouette Decl. at ¶ 5.  In addition, the Rouettes have introduced evidence that other individuals also dealt with corporate funds.  See id. at ¶¶ 4-5.  Such evidence would prevent a finding that QMSI "had in effect ceased or had never begun." Wells Fargo, 2011 WL 1225986, at *9.  On the other hand, Hyundai has introduced evidence that the Rouettes solely determined how much money to take as shareholder distributions and never consulted the corporation's CPA.  Defs' L.R. 56(a)(2) St. at ¶ 34. Hyundai has also introduced evidence that the Rouettes were the sole shareholders of the corporation and regularly used corporate funds for personal use.  See id. at ¶¶ 4-5, 34.  Based on this conflicting evidence, the court concludes that there are genuine issues of material fact as to whether QMSI was the alter ego of the Rouettes under the identity rule.  See Wells Fargo, 2011 WL 1225986, at *11 (finding that similar evidence raised a genuine issue of material fact as to whether the corporation was the alter ego of the defendants under the identity rule).  Therefore, Hyundai's Motion for Summary Judgment to pierce the corporate veil under the identity rule is denied.

17

**V.      CONCLUSION**

For the foregoing reasons, the Rouette's Motion to Strike (Doc. No. 58) is

**DENIED**.   The Rouettes' Motion to Strike (Doc. No. 56) is **GRANTED in part** and

**DENIED in part**.  Hyundai's Motion for Summary Judgment (Doc. No. 48) is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 30th day of January, 2013.


              /s/ Janet C. Hall
Janet C. Hall
United States District Judge